MARÍA FIGUEROA FUENTES, ETC., Plaintiff and Appellee, *v.* TELESFORO DÍAZ, Defendant and Appellant.

No. 10485. Argued February 2, 1953.—Decided June 30, 1953.

154

*Manuel Cruz Horta* for appellant. *Ernesto Juan Fonfrías* and *Santiago Polanco Abreu* for appellee.

Opinion of MR. JUSTICE NEGRÓN FERNÁNDEZ in which MR. JUSTICE BELAVAL concurs.

On July 25, 1952 there came to life in America the most precious and human of all postulates of social justice to which the democratic conscience of a nation may aspire: the equality of birth before the law. The chains which in our

legislation still bound the fate of the children born out of wedlock to the discrimination of the juridical inferiority and to the disgrace of social indignity—and which in sound construction of law and sound justice might have been partly slackened in *Vargas* v. *Jusino*, 71 P.R.R. 362, dis. op., p. 369—were shattered to pieces at the impact of the Bill of Rights of the Constitution of the Commonwealth of Puerto Rico,[1] the enactment of which repealed *ipso jure*,[2] as regards

---

[1] Section 1 of Article II of the Constitution of the Commonwealth of Puerto Rico—Bill of Rights—provides: "The dignity of the human being is inviolable. *All men are equal before the law. No discrimination shall be made on account of* race, color, sex, *birth,* social origin or condition, or political or religious ideas. Both the laws and the system of public education shall embody these principles of essential human equality." (Italics ours.)

As set forth in the Report of the Committee of the Bill of Rights of the Constitutional Convention, submitted on December 14, 1951, "The purpose of this section is to indicate clearly *as a consubstantial basis of everything that follows the principle of the human dignity and, as a consequence thereof, the essential equality* of man within our constitutional system. Equality before the law predominates over accidents or differences, whether they emanate from nature itself or from culture. Any discrimination or privilege in violation of this essential equality is repugnant to the system of law of Puerto Rico. Insofar as necessary, our legal system is hereby buttressed by this constitutional provision, as well as bound to enhance its provisions to accomplish fully the purpose of this section." By specific prohibition of discrimination by reason of *birth,* according to said report, "It is intended *to eliminate the juridical stigma against children born out of wedlock. All children,* are guaranteed *equal rights* with respect to their parents and with respect to the juridical order. Illicit relations may and should be forbidden and this provision shall tend to discourage them. *But the innocent offspring should come to the world free of juridical disqualifications or inferiorities.* It is thus required by *the principle of individual responsibility, pursuant to which no one is to blame for the acts which he himself did not perform. Although the present legislation already embraces most* of the provisions herein set forth, new laws must be enacted. For inheritance and property purposes future amendments to this section shall not be retroactive to births prior to its effectiveness." (Italics ours.)

[2] As regards the juridical effect of § 1 of Article II of the Constitution, the President of the Committee of the Bill of Rights of the Constitutional Convention, Mr. Jaime Benítez, stated the following, in the debates which in connection with the report of the Committee took place on January 2, 1952:

"Mr. Benítez: Further on in the fifth, sixth and seventh line it is stated that 'both the laws and the system of public education shall

the children born in, or after said date, the precepts of the Civil Code and of the other laws which in one way or other established classes and categories of children, by reason of birth.[3]

Although this case is not governed by the state of law which flows from the former constitutional precept, but by

---

embody these principles of essential human equality,' and what has been established herein are *certain basic and essential principles that have force 'expropio-vigore,'* but that *besides having force of their own* shall require completion of two kinds, educational and juridical. As regards the educational completion, there is already here an order to the public system of education which shall be ruled by these basic principles. As regards the juridical system and this refers to the whole legal structure of the country, *the unconstitutionality of any favoritism is underlined.* And any acknowledgment or distinction shall be prompted by merit, by virtue, by effort or by talent. As to what is meant by social origin, it means that no matter the person's descent, his economic situation and his position in the community, all the Puerto Ricans and all the persons subject to the laws of Puerto Rico are equal before our laws, if this provision is approved, and any attempt towards discrimination in favor or against a citizen is illegal." (Italics ours.) *Journal of the Proceedings, Constitutional Convention of Puerto Rico,* p. 524.

This was not the case in Spain when the Constitution of the disappeared Republic was approved on December 9, 1931. The merely "programmatic" precept, of its § 43, to the effect that "The civil laws shall regulate the inquiry into paternity," did not have the effect of repealing or interrupting *ipso jure* the precepts of the Civil Code connected with filiation. Judgments of the Supreme Court of Spain of March 11, 1940 and of January 29, 1935. The aforesaid § 43 contains, besides, the following precepts connected with the obligation of the parents to their children and the establishment of the legitimacy or illegitimacy of the latter:

"The parents are bound to support, assist, educate and instruct their children. The state shall see that these duties are fulfilled and subsidiarily binds itself to their execution.

"The parents shall have the same duties for the children born out of wedlock as for those born from marriage.

"No statements regarding the legitimacy or illegitimacy of the births or the civil status of the parents shall be set forth in the birth record or in actions of filiations." *Constitución de la República Española, Enciclopedia Jurídica Española,* Appendix 1931, First Edition, pp. 250, 255.

[3] Once the equality of rights of the children was established in principle by our Constitution—fundamental law of the State—Act No. 17 was approved on August 20, 1952 "To establish the equality of rights of children" retroactively to July 25 of that same year.

158

the juridical relations which are derived from the legislation in force at the date of birth of the minor plaintiff, December 19, 1948—mainly Act No. 229 of May 12, 1942 (Sess. Laws, p. 1296), amended by Act No. 243 of May 12, 1945 (Sess. Laws, p. 814)—we must not forget, upon establishing the scope and juridical effects of said law, that by the intrinsic merits of its own ethical values, the dignity of a human being must not depend, in order to be exalted and consecrated by the courts, upon the existence of a provision of law declarative of that standard of evaluation of the rights of man. The principle of dignification of the human being·pervades Act No. 229, within its limited sphere, although not expressly stated.[4]

I concur with the affirmance of the judgment appealed from, although on different reasons than those set forth in the opinion of Mr. Justice Ortiz. I also agree with his statement that "the main purpose of the Legislature in enacting § 1 of Act No. 229 of 1942 [was] to do away with any possible difference between natural and adulterine children born subsequent to the effectiveness of said Act." I do not believe, however, that said opinion gives "full expression to the sense of human equities which inspired the legislation under consideration," *Vargas* v. *Jusino, supra,* dis. op., p. 370, by subjecting the filiation suits under Act No. 229 to the narrow patterns of § 125 of the Civil Code, 1930 ed.,[5]

---

[4] The Commission of the Bill of Rights of the Constitutional Convention seems to have so understood it upon affirming, see footnote 1, that "the present legislation already embraces most" of the provisions on the prohibition of the discrimination by reason of birth. Of course, the only thing left was to eliminate the juridical inferiority of the children born out of wedlock, since Act No. 229 had already done so as to illegitimate children who are not natural children with respect to the natural ones.

[5] Said Section insofar as pertinent provides:

"Natural children are those born out of wedlock, from parents who at the moment when such children were conceived or were born, could have intermarried with or without dispensation.

"The natural child may be recognized by the father and mother conjointly or by one of them only either in the record of birth or in the testament or in any other public instrument.

"The father is obliged to recognize the natural child:

nor that it establishes, on the other hand, a rational juridical theory in overlooking—upon evaluating the elements of proof on *uninterrupted possession of status*—the requirement of *uninterruptedness* in said possession. Therefore I pass on to state separately the reasons on which I base my affirmative vote.

 Plaintiff files the present action in her capacity of *natural* daughter of the defendant according to the juridical scope fixed to said term by § 1 of Act 229, *supra*, which provides: "All children born out of wedlock subsequent to the date this Act takes effect, shall be natural children, whether or not the parents could have married at the moment when such children were conceived. These children will be legitimized by the subsequent marriage of the parents, to each other." Contrary to the stern criterion adopted in the aforesaid opinion in determining the right of filiation of this new "natural" children, I believe that § 125 of the Civil Code has been substantially modified by the impact, and ever since the enactment of Act No. 229, which "may be considered as a basic law which requires an elaborate and definite development of the different Sections of the Code, implicitly and directly affected thereby." Muñoz Morales, *Anotaciones al Código Civil*, First Book, p. 401.

In enlarging the scope, through Act No. 229, of the concept of natural children contained in § 125 of the Civil Code, the legislator evidently wanted to vanish, as to children born thereafter, the differences between the various categories of

---

"1. When there exists an indubitable statement in writing of the father wherein he expressly acknowledges his paternity.

"2. Where the child has uninterruptedly enjoyed the condition as of a natural child of the defendant father justified by acts of the same father or of his family.

"3. When the mother was known to have lived in concubinage with the father, both during her pregnancy and at the time of the birth of the child.

"4. When the child may present any authentic evidence of his paternity. . . ."

*illegitimate* children which existed in our legislation: illegitimate *natural* children and *other illegitimate children* (adulterines or incestuous). Therefore, to convey real meaning and full expression to that legislative intent, we must construe and apply Act No. 229 in a way that truly identifies both kinds of children, not merely in their juridical nomenclature, but *in their actual opportunities* of filiation, for it is undeniable that although Act No. 229 removes the juridical differences from the children, it does not remove—nor may it remove—the legal impediments of the parents, nor the criminal character of their intercourse, nor the punitive sanction imposed by society for the offense; and thereby if the adulterine or incestuous children under said law are submitted, in filiation suits, to the rules of evidence provided by § 125 of the Civil Code for the filiation of natural children, they would be burdened in their *real* opportunities for filiation, by the inequality arising from the juridical condition of their parents and the differences derived from the criminal relations out of which they were begotten. No true equality is created in that way between the illegitimate natural and other kinds of illegitimate children. This only tends to sanction the regime of inferiority of the latter, in their real impotence to be identified with the former. Thus an act of indignity committed by the father is perpetuated and the right of the child to its own dignity is immolated. This is not the scope of Act No. 229. Those can not and should not be its consequences.

Laws should be construed and applied in consonance with the social end inspiring them. They should not be isolated from the human problem whose solution they pursue; they must not be stripped of the realities of life which society itself has projected over them, for the sense of justice which inspires them would then become illusory and lost in a vacuum. Therefore, the requirements of proof of § 125 in cases of *concubinage* and *possession of status*—which were set forth in said Section for the purpose of actions of ac-

knowledgment of the former natural children, and which respond to real situations not proscribed in society—can not be the proper channels of real utility for the filiation of adulterine or incestuous children, begotten from socially proscribed relations.

Act No. 229, by the necessary implication of its social end, authorizes, for filiation purposes, an inquiry into the paternity of the illegitimate children not having the status of natural in the same way that nowadays that same paternity is investigated for support purposes. Otherwise, we would have to conclude that Act No. 229 does not really identify the adulterine or incestuous children with former natural children *in their opportunities* of filiation, for the latter would depend, in cases of concubinage and possession of status, on the proclamation of criminal acts, and faced with the reality that no man, according to his own standards of behavior in a social group, ever makes public ostentation either of adultery, or incest or of the children thus begotten, to submit the right of filiation of those children to the proof of the *concubinage* of their parents, or to the *possession of status*, would be equivalent to denying them beforehand any actual opportunity of acknowledgment, and to defeat the purpose of Act No. 229. If an *adulterine* or *incestuous* child were required to prove the *uninterrupted possession of status* by voluntary actions of acknowledgment of the father —according to the scope of paragraph 2 of § 125 of the Civil Code prohibiting inquiry into paternity, Judgments of the Supreme Court of Spain, of June 6, 1931, 200 *Jurisprudencia Civil* 247; April 26, 1916, 136 *Jurisprudencia Civil* 279; October 12, 1907, 108 *Jurisprudencia Civil* 558 and June 26, 1903, 95 *Jurisprudencia Civil* 1021—or to prove the *concubinage* of his parents at the time of his conception, his fate as a son "of chance and of the unknown" would be doomed, 1 Scaevola, *Jurisprudencia del Código Civil* 357, *Colón* v. *Heirs of Tristani*, 44 P.R.R. 163, because it would afford very meager or no opportunities to obtain filiation. It

would be difficult, if not impossible, for an *adulterine* or *incestuous* child born under Act No. 229 to obtain his filiation, unless the *paternity* established in an authentic manner by any means of legal proof, were considered as an operative factor of filiation under said law. The case at bar proves it. The concubinage, which was found proved by the trial judge, was not established by the evidence. The uninterrupted possession of the status of a natural child, in my opinion, is unreal. It may be reasonably forecast that under said Act there shall never be a judgment of filiation based on concubinage, in favor of an *adulterine* or *incestuous* child, because the latter, pursuant to § 125 of the Civil Code, would be compelled to prove that his parents behaved in public as married, when the truth is, —based in the habits of life and in the standards of behavior established by society—that nobody proclaims nor makes public ostentation of a crime— in such cases, adultery or incest. And likewise it may be foreshadowed that never—or almost never—a judgment of filiation shall be rendered in favor of one of such children, based on possession of status.

The requirements of proof of *concubinage* and of *possession of status* in the actions of filiation filed by adulterine or incestuous children born under Act No. 229, place them —due to the hardship of the illicit acts of their parents—at an obvious disadvantage, in their opportunities of filiation, compared with *natural* children born before the enforcement of said Act. The new juridical concepts of "natural" does not respond to the social reality under which the adulterine or incestuous children were begotten. To call them "natural children" and then mould them to the strict pattern of § 125 in order to have a father, certainly does not fulfill the legislative intent. If that is the impact of Act No. 229 on the previous legislation, we must then announce that in approving said Act the lawmaker did not eliminate the differences between the illegitimate children *not having the status of natural* and the *natural* children, but merely miti-

gated the crudeness of the concepts of *adulterine* or *incestuous*, calling them "natural," but without doing away with the harshness of their actual disadvantages as compared with the natural children. If that were the case, the adulterine or incestuous children born under the force of Act No. 229 would actually continue being as inferior as before, despite the new label of "natural" children, because said Act did not destroy their juridical inferiority to the natural children *in their actual opportunities of filiation*, but merely gave them a new name, without raising their category, since for the purpose of filiation it left them as adulterine, as incestuous and as devoid of justice as ever.

■ Our affirmative judgment of today does not fully achieve the end of social justice which inspired the Act in issue. Despite the outcome of this case, we have rather defeated that purpose. The elimination, because of obsolete and antijuridical, of the rule of "strong and convincing proof" of the possession of status,—which rule should have never taken root in our jurisprudence—is not achieved by the enactment of Act No. 229, nor does it offer an adequate means for the fulfillment of the broad social purpose of the statute. Even if said rule is done away with, paragraph 2 of § 125 requires that the adulterine or incestuous children prove the *uninterrupted* possession of the status of natural children. If said subdivision is applied its requirements must be fulfilled. That of *uninterruptedness*, in my opinion, is not present. Consequently, I consider that the evidence is insufficient to affirm the judgment on that ground.

■■ A juridical anachronism results when the judicial power denies consequences to, and renders void in its essential purpose of real equality—in its deep sense of human dignity—a precept of substantive law, because of the fact that the legislative power did not expressly provide for a mean to manifest said equality. But the right to paternity should not depend on the degree of skill employed in drafting a statute. Once its purpose is known as well as the

philosophy inspiring it, we should make effective its fundamental purpose. Equality does not allow for discrimination nor authorizes privileges. There can be no real equality between natural children and adulterine or incestuous children as long as the latter are submitted to the severity of an acknowledgment based on an *uninterrupted possession* of status and on *concubinage*, because in real life, under the established social order, those statuses if produced, are not consolidated, and if consolidated are not openly manifested so that the adulterine or incestuous children may derive benefit therefrom, the requirement of said proof actually constituting a denial of the right granted by Act No. 229 to investigate their origin.

Our generation has the duty of eradicating traditions and precedents which are archaic in our age because they are not up to the actual state of our collective conscience nor are they up to the progressive development of our judicial philosophy. The right of adulterine or incestuous children to filiation under Act No. 229 should be predicated on the investigation of paternity through any legitimate means of proof as said Act naturally implies; but never on public admissions of paternity, as required in the possession of status, or in public relations of adultery, which as regards the children, is required to prove concubinage.

■■ The *sense of injustice* which sometimes disturbs the conscience in its search for truth and which as an active, spontaneous source of law contributes its current to the juridic stream, makes a practical working difference in courts upon becoming an adequate criterion to reach a true *sense of justice* in the judicial controversies. Cahn, The Sense of Injustice, 11, 31. It would not be fair to deprive an adulterine or incestuous child from his filiation under Act No. 229, because he is not able to prove judicially the improbable fact that his father *confessed* or publicly *admitted* his paternity or publicly proclaimed his crime. Laws are made by men and are construed for men. Therefore, in their inter-

pretation, the reality of human life must predominate and not the dogmatic abstraction of eternal and invariable rules and much less the standards of social discrimination already repudiated by the fundamental law of the state even if prospectively. See, Max Radin, Law of Logic and Experience, p. VIII, 46, 160 *et seq.;*, Cardozo, Growth of the Law, pp. 87 *et seq.* and The Paradoxes of Legal Science, p. 31 *et seq.* Pound, Contemporary Juristic Theory, pp. 11, 17 *et seq.;* Garlan, Legal Realism and Justice, p. 13 *et seq.* In this age of social justice we must march towards the humanization of justice and of law, leaving behind in its rigorous decadence the dogmatic sense of law and of justice.

The scope of Act No. 229 must be fixed in order to give viability to the essential purpose of the legislator, placing emphasis in the social welfare as conceived by *"the social sense of justice* . . . immanent in the common mind," since "Perhaps the most significant advance in the modern science of law is the change from the analytical to the functional attitude. The emphasis has changed from the content of the precept and the existence of the remedy to the effect of the precept in action and the availability and efficiency of the remedy to attain the ends for which the precept was devised," Cardozo, The Nature of Judicial Process, p. 72 *et seq.,* and having in mind that "A thing which is within the spirit of a statute is within the statute, although not within the letter; and the thing within the letter is not within the statute, unless within the intention." *In re Lambrecht* (Mich.) 100 N. W. 606; *Common Council* v. *Rush* (Mich.) 46 N. W. 951; *cf.* § 19, Civil Code, 1930 ed. In so doing we would not be legislating, we would not be even traveling beyond the walls of the "interstices," Cardozo, *op. cit.,* pp. 98, 113 *et seq.*

It is my opinion that Act No. 229 has substantially modified § 125 of the Civil Code, incorporating thereto those means of proof permitted until then in the investigation of the paternity of an illegitimate *not natural* child. In other

words: it broadened the scope of the juridical consequences of the judicial investigation of paternity, allowed for the illegitimate children *not having the status of natural* under § 129 of the Civil Code,[6] in connection with § 128 of the same legal body, prior to Act No. 229, in the civil action for support, and that after the enactment of said law and under it, should be permitted to all illegitimate—now "natural" children—in the action of filiation. This is so because although they are called "natural," the adulterine or incestuous children continue being such, and the judicial investigation of the *natural* paternity authorized by paragraph 4 of § 125 of the Civil Code, "When the child may present any authentic evidence of his paternity," is not nor can it be an adequate means for the investigation of the illegitimate paternity of *not natural* children which by necessary implication is the one authorized by Act No. 229. The legislator was aware of the state of our jurisprudence interpretative of § 129 of the Civil Code,[7] and upon making the illegitimate *not natural* children acquire the legal status of "natural," evidently they also acquired the means of proof provided by the aforesaid § 129 for the investigation of the paternity of illegitimate children *not having the status of natural.* Therefore, that requirement having been fulfilled and the

---

[6] The afore-cited Sections provide:

"Section 128.—The illegitimate children lacking the lawful qualification of natural children are only entitled to such support from their parents, as is prescribed in Section 143."

"Section 129.—The right to the support mentioned in the preceding Section can only be exercised:

"1.—Where the paternity or maternity is inferred from a final judgment rendered in a criminal or civil action.

"2.—Where the paternity or maternity is shown by a indubitable document from the father or mother wherein the filiation is expressly recognized."

[7] *Rivera* v. *Cardona,* 56 P.R.R. 786; *Cerra* v. *District Court,* 67 P.R.R. 872; see *People* v. *Rohena,* 52 P.R.R. 301; *People* v. *López,* 54 P.R.R. 279; *People* v. *Rotger,* 55 P.R.R. 133; *People* v. *Pérez,* 55 P.R.R. 655; *People* v. *Rodríguez,* 67 P.R.R. 688; *People* v. *Ramos,* 61 P.R.R. 322; *Rodríguez* v. *Cruz,* 68 P.R.R. 696; *People* v. *López,* 67 P.R.R. 732; *Sánchez* v. *District Court,* 64 P.R.R. 456.

paternity in this case satisfactorily proved, I vote for the affirmance of the judgment, independently of the insufficiency of the evidence of concubinage and possession of status. The social purpose of Act No. 229 and the state of that jurisprudence—source of authority for the investigation of the paternity of illegitimate *not natural* children—make the former conclusion inescapable. To interpret Act No. 229 differently is to perpetuate the actual juridical contradiction —rather a juridical monstruosity—that the paternity having been judicially established, and the impediment for his filiation having disappeared, the child is not entitled to have a father, even though as such father he is ordered to support him: the child has support but has no name; parenthood is established by the judicial power, but such a parenthood carries no juridical consequences, because the State protects that "supernatural and miraculous entity . . . which may only be known when he deigns to descend from the throne of sexual passion and moved by pity or by mercy, he anoints the head of his child with the precious unction of filiation" 1 Scaevola, *Jurisprudencia del Código Civil* 357. Not to convey that meaning to Act No. 229, but to insist, instead, in the inexorable application of § 125 of the Civil Code— which was inspired by the conservative social philosophy of § 135 of the Spanish Civil Code, and predicated in turn on the *voluntary acknowledgment* and the prohibition of the investigation of paternity—is to shut our eyes to the social reality of the law. The following words from Mr. Justice Frankfurter in his dissenting opinion in *Pope* v. *Atlantic Coast Line Railroad Co.* 345 U. S. 379, 392, 97 L. ed. (Advanced pp. 719, 726), seem to be written for the occasion: "To disregard the natural implications of a statute and to imprison our reading of it in the shell of the mere words is to commit the cardinal sin in statutory construction, blind literalness."

The rights of the adulterine or incestuous children born in Puerto Rico in the decade of 1942 to 1952 under Act

No. 229—which decade penetrates into the second half of the Twentieth Century with a clear and deep sense of the rights of man—should not be submitted to the severity of a philosophy of privilege of birth which, in a manifest denial of the principles of human equality, was inspired by the Spanish legislation on the second half of the Nineteenth Century. In order to impart concretion of reality to those rights they must be measured by the standards of social justice which inspire the Puerto Rican legislation at present. The imperative social function of justice demands it.

---

Opinion of MR. JUSTICE ORTIZ in which MR. CHIEF JUSTICE SNYDER concurs.

This is a filiation suit originally brought in the former District Court of Puerto Rico, Bayamón Section, wherein judgment was rendered for the plaintiff. It is alleged in the complaint that María Figueroa Fuentes, while unmarried, sustained concubinage relations under the same roof with the defendant since February 1948, the latter being married to another woman, and that from these relations the minor Migdalia Figueroa was born on December 19, 1948. It is further stated in the complaint that the minor is and has always been in the uninterrupted possession of the status of natural daughter of the defendant and that "from the time plaintiff became pregnant until the minor was born and thereafter defendant has always treated the minor, publicly and privately, as his daughter, having furnished plaintiff prior to giving birth to said minor, with support for her care and attention and for childbirth." The defendant denied the facts alleged in the complaint. Upon rendering judgment for the plaintiff the lower court made the following findings of fact:

"1.—Telesforo Díaz is a married man since 1934, but this fact does not preclude nor has precluded him from committing adultery, by virtue of which he has begotten children out of wedlock.

"2.—María Figueroa Fuentes is a divorced young lady but of good reputation insofar as her chastity is concerned, who lives and has lived for some years together with her mother within the municipality of Naranjito.

"3.—The plaintiff (*sic*) made love to María on February 1948 and upon accepting him they sustained concubinage relations during six months, which was known to the neighborhood in the domicile of María's mother.

"4.—As a result of these relations a girl was born on December 19, 1948 who was recorded in the Registry of Vital Statistics as the natural daughter of María Figueroa under the name of Migdalia Figueroa.

"5.—While María Figueroa was pregnant and subsequently (*sic*) to childbirth, the defendant performed acts of acknowledgment, publicly, tending to show that he is the girl's father, such as visiting María, urging her to procure a miscarriage by means of a criminal abortion, for which he gave her $25; sending her $10 with her brother while she was in the hospital; insisting in complying with his fatherly duties on condition that plaintiff should give up her daughter to his wife; and finally being affectionate and lovable with the child when he saw her for the first time at his house.

"6.—The defendant has refused to acknowledge this child as his own, for which reason he has also refused to give her his name and support.

"7.—The Judge writer of this opinion noticed a certain physical resemblance between the defendant and the child."

The trial court made the following conclusions of law:

"1.—The Court has jurisdiction over the parties as well as of the subject matter.

"2.—The facts alleged in the complaint are sufficient to constitute a cause of action.

"3.—The defendant Telesforo Díaz sustained concubinage relations with María Figueroa Fuentes in the domicile of the latter's mother, this domicile constituting the roof under which they sustained said relations privately and publicly.

"4.—Telesforo Díaz is the natural father of Migdalia Figueroa.

"5.—Migdalia Figueroa is entitled to bear her father's surname and therefore she should be recorded and publicly acknowledged as Migdalia Díaz Figueroa.

"6.—Migdalia Díaz Figueroa is entitled to receive support from her father Telesforo Díaz and the latter is under the obligation to give it."

The defendant has appealed to this Court and assigns the following errors:

"FIRST ERROR: The District Court committed error in concluding that 'Telesforo Díaz sustained concubinage relations with María Figueroa Fuentes in the domicile of the latter's mother, this domicile constituting the roof under which they sustained said relations privately and publicly' (paragraph 3 of the Conclusions of Law at folio 10—Trans. of Ev.).

"SECOND ERROR: The District Court committed manifest error in weighing the evidence acting with prejudice and partiality and erroneously concluding that the evidence showed a public and private concubinage between plaintiff and defendant, this being the sole ground on which the court rests its judgment, the reversal of which therefore lies."

■ This is the case of an alleged illegitimate child formerly known as an adulterine child from parents who at the time of the minor's conception could not intermarry. In view of the fact that the minor was born in December 1948, the action should be governed by Act No. 229 of May 12, 1942 (Sess. Laws, p. 1296), as amended by Act No. 243 of May 12, 1945 (Sess. Laws, p. 814). Section 1 of this Act provides that: "All children born out of wedlock subsequent to the date this Act takes effect, shall be natural children, whether or not the parents could have married at the moment when such children were conceived. . . ."

Section 2 provides as follows:

"Children born out of wedlock prior to the date this Act takes effect, and who lack the qualifications of natural children according to previous legislation, may be recognized for all legal purposes by the voluntary action of their parents, and in their default, by that of the persons having the right to inherit therefrom. These children will be legitimized by the subsequent marriage of the parents, to each other.

"In case the children referred to in this Section are not recognized by the voluntary action of their parents, and in

default of the latter, by that of the persons having the right to inherit therefrom, said children shall be considered as natural children for the sole purpose of bearing the surname of their parents. The action for this recognition shall be prosecuted in accordance with the procedure fixed by the Civil Code of Puerto Rico for the recognition of natural children; *It being understood, however,* That such a recognition shall only have the scope herein expressed."

The first problem we are confronted with is of determining whether the child born out of wedlock subsequent to the enactment of Acts Nos. 229 of 1942 and 243 of 1945, must show, in a filiation suit, that he is covered by the provisions and requirements of § 125 of the Civil Code, that is, that his parents lived in concubinage at the time of the conception and birth of the child, or that the child is in the uninterrupted possession of the status of natural child or that there exists an indubitable document of the father in which he expressly recognizes paternity or any other authentic proof of paternity. With respect to children born out of wedlock prior to the effectiveness of Act No. 243 of 1945, said Act specifically provides that the action of acknowledgment shall be prosecuted in accordance with the procedure fixed by the Civil Code of Puerto Rico, in case the children are not acknowledged by the voluntary action of the parents. This implies the application in such cases of the provisions of the afore-mentioned § 125 of the Civil Code. *Vargas* v. *Jusino*, 71 P.R.R. 362, 365. Section 125 refers to acts indicating acknowledgment on the part of the father, but these acts, as a matter of procedure, must be proved in a filiation suit. However, as to children born out of wedlock subsequent to the effectiveness of Act No. 229 of 1942, as is the case herein, they are all declared natural children irrespective of whether or not their parents contracted marriage at the time of the conception of said children, pursuant to § 1 of said Act. This Section does not expressly provide that the acknowledgment of said children shall be prosecuted

under the Civil Code. Nevertheless, we believe that it was the main purpose of the Legislature in enacting § 1 of Act No. 229 of 1942 to do away with any possible difference between natural and adulterine children born subsequent to the effectiveness of said Act. It was not its purpose to eliminate the requirements of proof contained in § 125. If such would have been the legislative intent, the Legislative Assembly would have expressly repealed or amended said Section. There was no implied repeal inasmuch as the creation of equality between children born out of wedlock is not incompatible with the necessity of proving the status of said children by means of certain type of evidence.

However, since § 125 of the Civil Code is applicable to the present case, the lower court erred in concluding that the evidence showed that María Figueroa Fuentes and Telesforo Díaz had lived in concubinage. Plaintiff's evidence on this point, which was believed by the trial court, was to the effect that the defendant made love to María Figueroa Fuentes, minor's mother, and about February or March 1948 they had sexual relations; that she lived in the house of her mother in "Cerro No. 2" of Naranjito; that the defendant, who was a married man and lived in Corozal, visited María twice a week, going into the house early in the evening and leaving at dawn or early in the morning; that when the minor's mother had been pregnant for four months he gave her $25 for an abortion but that it was not carried out; that after María became pregnant he only visited her three times and the minor was born on December 19, 1948. Although the fact that the putative father has a separate residence from the mother is not incompatible with the existence of a state of concubinage and although it is not necessary that the man and his mistress should hold themselves out to the public as man and wife in order to establish concubinage, nor that their relationship be notorious, *Estela* v. *Heirs of Medrano*, 51 P.R.R. 531, yet mere sporadic visits for the purpose of having sexual relations

which are not similar to a marital state, which is real, without the need of matrimony, are not sufficient to constitute a state of concubinage. *Estela* v. *Heirs of Medraño, supra,* at page 537. The concept of concubinage essentially constitutes the relation between a man and a woman who live as husband and wife without being such. *Vázquez* v. *De Jesús,* 65 P.R.R. 846. In this case the evidence does not show that María Figueroa Fuentes and the defendant lived as husband and wife. However, the appeal is taken from a judgment and not from the reasoning of the opinion and the judgment rendered in this case may and should be upheld on other grounds. *Cf. Bianchi* v. *Heirs of Bianchi,* 67 P.R.R. 557, 564; *Cruz* v. *Carrasquillo,* 61 P.R.R. 422. We believe and hold that in view of the special circumstances of this case the uninterrupted possession of status was proved. It is true that this Court has held that evidence on uninterrupted possession of status should be strong and convincing. *Santiago* v. *Martínez,* 72 P.R.R. 873, 880; *Vargas* v. *Jusino, supra; Vázquez* v. *Boyrié,* 52 P.R.R. 826, 829; *Torres* v. *Heirs of Caballero,* 39 P.R.R. 654, 660; *Fontánez* v. *Heirs of Buxó,* 36 P.R.R. 202, 207; *Vega* v. *Heirs of Vega,* 32 P.R.R. 548, 551; *Medina* v. *Heirs of Bird et al.,* 30 P.R.R. 151, 155; *Marrero* v. *Fordham et al.,* 27 P.R.R. 649, 653, *Méndez* v. *Martínez,* 21 P.R.R. 238, 253; *Negueruela* v. *Somohano,* 16 P.R.R. 658, 660. We should not apply to this case such a strict and stern rule of construction. In the first place, the statute merely requires a showing of "uninterrupted possession of status." There is nothing in the act requiring a specific "quantum" or type of evidence to justify the compliance with said requirements. The concept of "strong and convincing evidence" is attached to the statute by judicial construction and should not be transformed into a categorical imperative, mechanical and inflexible which would tend to obstruct the truth and justice in any particular case. Let us break away from the tyranny of words and from the restraint of purely mechanical con-

cepts in order ·to enjoy conscientiously the judicial freedom of delving into the merits of each case, from the stand point of the.realities of life and of specific social and individual interests. This does not mean, naturally, that we should ignore the letter of the law and that the fancy, or even·the philosophy, of the trier be used to substitute or sacrifice the statutory provision. This is a government of law and not of men. But the convenience of avoiding an individualized justice beyond the scope of the law is compatible with the *desideratum* of construing the language of the statute dynamically, flexibly and realistically.

■■ As to the problem before us, we understand, that in requiring proof to establish the filiation, the judge is faced with the dilemma of doing justice to innocent children, especially in the light of the full recognition of the essential human equality that should prevail and recognizing at the same time that the status of a child, and his standing as a member of the family have a significant social meaning and that, therefore, no doors should be left open to sham or fraudulent claims of filiation. The exclusion of rigid categories must not imply that the judge should fail to comply with his high social responsibility of carefully weighing the evidence in cases of filiation and of deciding in accordance with the authentic preponderance of the evidence. On the other hand, the appeal to the social transcendence of the relationship between father and son often serves as the "inarticulate premise" on which an attitude adverse to equality between all children, whether legitimate or natural is based. That is why we, as judges, must add vitality to the letter of law, not precisely from the viewpoint of our individual philosophy but from the viewpoint of the philosophy prevailing in the community, as the same transpires from the evolution of the laws. Unless the letter of the law demands a particular construction, the legislative and social background of the statute in question.as well as subsequent statutes *in pari materia* may be used as an aid to the proper interpreta-

tion so as to harmonize adequately the general purport of the legislature. 50 Am. Jur. 274 *et seq.*, 328, 329, 343 *et seq.* Pursuant to § § 18 and 19 of our Civil Code, the statutes referring to the same subject matter or which have a common purpose, should be construed with reference to one another, inasmuch as the clear expression of one provision may be taken to explain a doubtful significance in another, and, in addition, because it is a fundamental and universal rule that the best means to discover the true sense of a statute where the context is ambiguous, is to study the policy and spirit of the Act, or the cause or reasons which induced the legislative power to enact it. It is important, therefore, that we consider the historical background of the concepts with reference to the filiation of illegitimate children and to the manner of proving said status, that is, in the substantive as well as in the adjective aspect.

Under the early Roman law great emphasis was placed on the institution of the family which formed an *imperium in imperio* more ancient than the State. Hunter, *Derecho Romano*, p. 34. There the patriarchal theory of the family prevailed, its basis being the paternal power. Sherman Roman Law in the Modern World, Vol. 2, p. 44. This concept implied a harsh attitude toward the rights of illegitimate children. 30 Col. L. Rev. 308, 310: "The Familiar Property Rights of Illegitimate Children: A Comparative Study." On the other hand it was quite easy to prove the status of illegitimate children it being a simple question of fact without any restriction except as to any other question of fact in any other juridical relation. 30 Col. L. Rev. 322.

Under the early French law, prior to the Code Napoleón the inquiry into fatherhood was in no way restricted, the testimony of the presumptive mother being sufficient to establish the maternity, under the maxim *creditur virgini parturienti asserenti se pragnantem esse es aliquo.* See Colin y Capitant, *Derecho Civil*, Vol. 1, p. 621. But such were the abuses committed against this blanket freedom that

later, for over one century, § 340 of the Code Napoleon prevailed in France forbidding the inquiry into fatherhood and providing that, except in cases of abduction, the filiation of a natural child could only arise from the voluntary acknowledgment by the father. Colin y Capitant, *op cit.*, p. 621. The new idea fell outside of its scope (1 Manresa 631, 6th Ed.) and it was based on the desire to avoid scandals, arbitrary decisions and blackmail in cases where it is difficult and at times impossible to prove the paternity with absolute certainty on account of the "impenetrable veil of mystery enveloping fatherhood," as stated by the author of § 340. 1 Manresa, *op. cit.*, 630. In Colin y Capitant, *op. cit.*, 623, said grounds are discussed as follows:

"The rebuttal of the first of these arguments is easy. The statute contemplates civil as well as criminal prosecutions in actions of divorce, denial of paternity, adultery, proxenetism, crimes against honesty and good usage, which are as disagreeable and as disturbing of the family peace as any suit of inquiry into fatherhood. Is not the most serious of scandals produced by a legislation which permits the abandonment of mothers and minors causing a state of demoralization with its horror of sexual acts, especially amid large conglomerations of working people?

"As to the second argument, it must be admitted that it is notoriously exaggerated. Proof that it is not absolutely impossible to establish the natural paternity is that the statute permits it in one case, abduction. And, furthermore, it is not difficult to conceive any number of hypotheses where paternity is founded on verisimilitudes, on presumptions of such import as those which arise from either abduction or voluntary acknowledgment by authentic papers. So it happens particularly in cases of rape, of admissions of paternity made in writing repeatedly and formally, of possession of status. The uninterrupted cohabiting on the part of a concubine with a man, who live as husband and wife, does it not entail the same presumption of sexual relations as derived from marriage? And the presumption of fidelity which must corroborate the preceding so as to complete the proof of parentage, a presumption which, in the case of a married woman, springs from the very fact of

marriage, can it not be considered implicit when the conduct of the unmarried mother, apart from her relations with her paramour, does not give rise to any sort of criticism?

"The new rule prohibiting the inquiry into fatherhood, so poorly justified, so inhuman and so unfair in its results should not subsist.

"Outside of France such a rule does not partake of the popularity which for a long time was attached to the Code Napoleon. The German and Anglosaxon countries remained true to the contrary view. Switzerland whose cantons were divided on this question, expressed in its Civil Code (§ 307) its adherence to the system of inquiry. A region, the Rhine countries, which at first practiced the French system, had to admit the inquiry into fatherhood after the effectiveness of the German Civil Code (§ § 1716 and 1717) ; this legislative amendment brought about wholesome results. Belgium has likewise admitted the inquiry into fatherhood by virtue of its Act of April 23, 1908.

"In France, under the influence of its literature full of dramatic fiction, naturally sympathizing with the natural child, a movement of protest promptly started against the doctrine of § 340. In this movement there marched side by side publicists from adverse fields: Victor Hugo and Le Play, and lawyers having diametrically opposite views; Acollas next to Jacquier and Lacoierta. Finally, after several idle attempts of legislative reform, Parliament, accepting a proposition of Gustave Rivet and Beranger, which dated back to 1905 and which had undergone numerous amendments, decided to approve the Act of November 16, 1911, (*sic*) which as introduced in § 340, suppresses the rule of blanket prohibition of inquiry into fatherhood out of wedlock and substitutes it for the rule of judicial inquiry permitted and organized on a certain number of hypotheses expressly limited."

Section 340 of the Code Napoleon, now substituted by the Act of November 16, 1912, forbade inquiry into fatherhood, as a means of proof. Irrespective of its merits, § 340 was adopted by several countries such as Belgium, Greece, Holland, Roumania, Haiti, Costa Rica, Bolivia, Uruguay and Venezuela. 1 Manresa *op. cit.*, 631. On the other hand, the free inquiry into parentage by means of any kind of

proof has been accepted in England, Scotland, many states of the United States of America, Sweden, Norway, Denmark, Austria, Hungary, Germany, Switzerland, Brazil, Mexico, Perú, Chile, Argentina, Guatemala, Salvador and Honduras. Manresa, *op. cit.*, 631.

In Spain, prior to the effectiveness of the Civil Code, the rights and actions of illegitimate children were determined by Law 11 of Toro. Under this law, the requirements to establish filiation of a child were the following:

(1) Born of a father who at the time of conception or of its birth could have validly married without dispensation and

(2) Acknowledged by his father, either expressly or impliedly. *Planellas* v. *Heirs of Planellas*, 59 P.R.R. 372, 387; *Castro* v. *Solís et al.*, 19 P.R.R. 645; *Ramírez et al.* v. *Ramírez et al.*, 30 P.R.R. 574.

Law 11 of Toro provided ample field for the proof of filiation, inasmuch as it accepted implied acknowledgment by any of the means of proof established by law. 1 Manresa 621, 6th ed. However, with the enactment of the Civil Code, § 135 thereof, counterpart to our § 125, went into effect. Under § 135, the father may be compelled to acknowledge his natural child when an indisputable paper written by him, expressly acknowledging his paternity, is in existence or when the child has been in the uninterrupted possession of the status of a natural child justified by the conduct of the father himself or that of his family. Our § 125 goes still further and admits, to establish filiation, proof of the concubinage of both parties and authentic proof of the paternity. The Spanish Civil Code as well as our Code adopt a happy medium as to the inquiry into fatherhood, for they do not provide for a blanket prohibition, as in France, nor permit it freely in all the cases. They merely permit proof of the filiation and of the paternity in the cases expressly mentioned in the Code, which we have enumerated. 1 Man-

resa, *op. cit.*, p. 630 *et seq.* But in so doing nothing was said in these Codes as to the kind of proof necessary to establish the existence of one of the cases, or of one of the situations listed in the Code. The requirement of "strong and convincing evidence" has been imposed by the courts and not by the Code. It is tantamount to the judicial, not statutory, creation of a rule of evidence as to the kind of proof required in the light of a specific judicial philosophy or policy. It is this policy which is now under our consideration. Let us first understand the legislative and constitutional policy prevalent in Puerto Rico as to the substantive rights of illegitimate children.

We have already noted that Acts Nos. 229 of 1942 and 243 of 1945 establish equality between "adulterine" and natural children born after the effectiveness of those statutes. Under Act No. 448 of 1947 (Sess. Laws, p. 179), the hereditary estate of a deceased shall be divided share and share alike among all his children, whether legitimate or natural. *Cortés* v. *Cortés*, 73 P.R.R. 643. Section 1 of Article II of the Constitution of the Commonwealth of Puerto Rico provides that all men are equal before the law; that no discrimination shall be made on account of birth, social origin or condition and that the laws shall embody these principles of essential human equality. The report of the Commission of the Bill of Rights of the Constitutional Convention which was approved by our Constitution says, in part, the following:

"The purpose of this section is to indicate clearly as a consubstantial basis of everything that follows the principle of the human dignity and, as a consequence thereof, the essential equality of man within our constitutional system. Equality before the law predominates over accidents or differences, whether they emanate from nature itself or from culture. Any discrimination or privilege in violation of this essential equality is repudiated by the system of law of Puerto Rico. Insofar as necessary, our legal system is hereby buttressed by this con-

stitutional provision, as well as bound to enhance its provisions to accomplish fully the purpose of this Section.

" . . . . . . .

"*Birth.* It is intended to eliminate the juridical stigma against children born out of wedlock. All children, in respect of their parents and in respect of the juridical order, are guaranteed equal rights. Illicit unions may and should be forbidden and this provision shall tend to discourage them. But the innocent offspring should come to the world free of juridical discriminations or inferiorities. It is thus required by the principle of individual responsibility, pursuant to which no one is to blame for the acts which he himself did not perform. Although the present legislation already embraces most of the provisions herein set forth, new laws must be enacted. For inheritance and property purposes future amendments to this Section shall not be retroactive to births prior to its effectiveness.

"*Social origin.* This provision reiterates the doctrine of discarding any inequality, favoritism or prejudice, whatever might be the legal merits of the action, of an application in the public service, of a bid, etc., for reasons of social origin or condition."

Finally, Act No. 17 of August 20, 1952, entitled: "To Establish the Equality of Rights of Children," provides that all children have with respect to their parents and to the property left by them, the same rights as those of the legitimate children, this provision being retroactive to July 25, 1952.

All these provisions speak eloquently and definitively of a strong legislative as well as constitutional policy and philosophy in pursuit of equality for children. In construing § 125 of our Civil Code we should not disregard those pronouncements, whose "tonic" must be considered in the formulation of a general hermeneutic criterion. *Cf.* Judgment of May 25, 1945 of the Supreme Court of Spain. Just as the Commission of the Bill of Rights points out in its report, we should discard all inequality, favoritism or prejudice, whatever may be the legal merits of an action, which might be of the same nature of the present action. In expressing

our disagreement with the view that the evidence must be "strong and convincing" in cases of filiation as the one herein, we are not legislating, but merely eliminating a purely judicial interpolation which this Court had inserted in the statute. We reject the narrow construction of § 125 of the Civil Code and we adopt a declarative construction, which merely declares what the statute says, that is, that the uninterrupted possession of the status must be proved, without any previous judicial test as to the kind of evidence required. In short, we disagree with the automatic application to all the cases of a restrictive rule as to the quantum of evidence required. We prefer to allow in each particular case a certain margin to seek the truth as to the filiation of a child, and the judge should fully assume his delicate mission of gauging the truth and of deciding in accordance with the preponderance of the evidence, without feeling the weight of a mechanical or artificial rule.

██ We shall now examine the evidence presented in this case. According to the evidence introduced by the plaintiff and believed by the lower court, in connection with the possession of the status, when the mother was in the hospital, the defendant sent her $10. On another occasion, the defendant asked the mother, through a third person, to send him the child in order to acknowledge her together with his wife. Plaintiff sent the girl three times to defendant's house and on one of those occasions the defendant took the child in his arms and held her for about two hours. Defendant's wife also asked that the child be given to her and her husband in order to acknowledge her.

Taken in an isolated fashion, it could be argued that said evidence, under the prevalent rule in this jurisdiction, which we now discard, was neither strong nor convincing. Taking the problem as one of preponderance of the evidence which the court might believe not in an openly erroneous manner, and as one of inquiry and showing of the truth, this evidence should be considered in the light of the whole set of circum-

stances of the case. In the first place, the concept of "uninterrupted possession of status," insofar as the adjective "uninterrupted" is concerned, has been correctly defined in *Colón* v. *Heirs of Tristani*, 44 P.R.R. 163, 173-174, as follows:

". . . . . The adjective *'continuo,'* according to Scaevola, has several meanings and in the case of Section 135 it may not be taken to mean 'uninterrupted,' but as 'a thing that follows another,' and it is to be interpreted with the word 'constant,' which means perseverance or repetition of acts. In our opinion, the word *'continuo'* (uninterrupted) should be taken to mean a series of acts, a set of facts carried out by the person from whom the acknowledgment is claimed, sufficient, if considered as a whole, to constitute the uninterrupted condition of a natural child. Once these series of acts have been carried out for a reasonable length of time, the father should not be allowed to revoke with his subsequent acts the acknowledgment priorly made by him. To establish a contrary principle would be equivalent to authorize the father to set aside certain facts which should have been insufficient for the child to obtain his acknowledgment, if the action had been brought prior to the date in which the relations existing between them had been interrupted."

In other words, the *continuity* refers to a set of facts which, although interrupted, are related to one another and are made manifest through a reasonable length of time. There is no fixed formula as to a specific number of facts which might be required or as to the length of time. In the case at bar, the child was born on December 19, 1948, and the complaint was filed on September 19, 1949, that is, nine months later. The period of time for performing acts which led to the possession of status was rather short. But the child should not be penalized for having filed the complaint promptly and we must consider that if the acts of the defendant and his family were rather sparse, it was possibly due to the date when the complaint was filed. The case might be different if several years had elapsed between the birth and the filing of the complaint in the filiation suit, inasmuch

as, in that case, if the defendant had originally performed certain isolated acts, his silence or inactivity during a long period of time could suggest an implicit repudiation of the original acts.

Another particular point in this case refers to the fact that the father appeared in the suit and in his testimony denied substantially that he had performed the acts which plaintiff alleges. He had a fair opportunity to attempt to prove that the claim was false, but the trial court did not believe his testimony nor that of his witnesses. The essential rule in this kind of cases is to avoid fictitious claims as to the status of a child as a member of the family. But if the father himself has the opportunity to appear, testify and present evidence, the probabilities of false allegations of filiation are foreclosed. The fact that the testimony and the evidence presented by a defendant were not believed by the court, does not alter the reality that he had the occasion and opportunity to reject the complaint and, on the contrary, said fact bolsters plaintiff's claim. The case might be different if death had sealed the father's lips, thereby foreclosing the possibility of presenting fully adequate conditions on which to reject an action of filiation.

Another element that singles out this case is the fact that the child in question was known previously as *adulterine*. In such cases, a married father, in a certain social atmosphere, is not inclined to make any ostentation of his relationship to that kind of children. That reluctance constitutes a relevant factor as to the uninterrupted possession of status, as has been accepted by the jurisprudence, when pointing out the difference in the treatment between a legitimate and a natural son. Judgments of June 26, 1903 and June 15, 1936 of the Supreme Court of Spain.

Although technically it was not shown that the mother and the defendant lived in concubinage, the lower court found

that they sustained sexual relations, to the extent that the defendant visited the mother twice a week, staying with her until daybreak and till morning, and there was evidence believed by the court to the effect that when she was pregnant the defendant gave her $25 to procure a miscarriage. From the point of view of the judicial inquiry into the truth of things, these facts tend to show the actual fatherhood.

All those factors tend to show that the concept of uninterrupted possession of status has not a fixed and unassailable significance, but that it should be construed dynamically in harmony with the realities involved in each particular case. Under these rules we must reach the conclusion that the lower court acted correctly in granting the complaint.

We shall not close this opinion without referring to a noble expression of Mr. Chief Justice del Toro in his dissenting opinion in *Ortiz* v. *Dragoni*, 59 P.R.R. 14, 29, where he says:

"There should be no fatherless children. The responsibility that binds the man who begets a human being to his offspring should not be eluded. Once his paternity is established and it is shown that the same has been in any way acknowledged by the father, it should not be permitted that selfishness, family connections, or, the serious material and moral consequences generally attaching thereto, should destroy the first spontaneous urge to which nature itself responded, because that first act embodied truth and justice."

Notwithstanding the different views emanating from this opinion as well as from the opinion of Mr. Justice Negrón Fernández, a majority of this Court—composed of Mr. Chief Justice Snyder, Mr. Negrón Fernández, Mr. Justice Belaval and the writer—agrees in that the rule on strong and convincing evidence in cases of filiation is obsolete and should be discarded and it is hereby discarded from our jurisprudence.

The judgment will be affirmed.

MR. JUSTICE MARRERO, with whom MR. JUSTICE PÉREZ PI-
MENTEL concurs, dissenting.

I must indeed agree that the evidence did not show the
existence of a state of concubinage between the minor's
mother and the defendant. Plaintiff herself so admits in
her brief, page 8 of which reads as follows:

"PROOF OF CONCUBINAGE

"In the light of the above-copied evidence we have before
us the only proof which tends to establish the concubinage. It
is the testimony of some witnesses for the plaintiff to the effect
that Telesforo Díaz Marrero and María Figueroa sustained the
relations of husband and wife (testimony of Rosa Nieves Ro-
sado, p. 17, Tr. of Ev.) ; and other testimony which tends to
show that he stayed overnight with María Figueroa, in her
room, twice or more during the week. .

"We say that this is the only proof with the utmost profes-
sional sincerity. In saying so we are conscious that in Puerto
Rico it has been repeatedly held that the concubinage to which
our Civil Code refers is the act on the part of a woman of
cohabiting with a man, as husband and wife, without being
actually married. We are conscious, furthermore, that the
state of concubinage can not be established by the mere relation
of a man with a mistress. As to both particulars see *Rodríguez*
v. *Cruz*, 68 P.R.R. 696; *Bianchi* v. *Heirs of Bianchi*, 67 P.R.R.
557; *Montañez* v. *Rodríguez*, 67 P.R.R. 198; *López* v. *Rodrí-
guez*, 68 P.R.R. 700; *Colón* v. *Succession of Tristani*, 45 P.R.R.
219; *Medina* v. *Heirs of Bird et al.*, 30 P.R.R. 151; *Estela* v.
*Heirs of Medraño;* 51 P.R.R. 531; *Vázquez* v. *De Jesús*, 65
P.R.R. 846 and others.

"Notwithstanding our knowledge of the juridical concept
of the term 'concubinage,' it seems fair to point out that it was
the lower court that had the opportunity to determine, after
hearing and seeing plaintiff's witnesses, and to judge accurately,
the scope of the testimony of said witnesses when they testified
that María Figueroa and Telesforo Díaz sustained concubinage
relations during six months, with the knowledge of the neigh-
borhood. The findings of the court on this score must be up-
held by this Court."

As stated in *Vázquez* v. *De Jesús*, 65 P.R.R. 846, 848, citing the cases of *Colón* v. *Heirs of Tristani*, 44 P.R.R. 163 and 45 P.R.R. 219 and *Gerena* v. *Suau*, 36 P.R.R. 151, the term concubinage "essentially comprises the relationship between a man and a woman who cohabit together as spouse without being such." In this case the evidence does not reveal that María Figueroa Fuentes and the defendant cohabited as spouses but merely that they sustained sexual relations. I admit, therefore, that the lower court committed error in declaring that the plaintiff minor was the natural daughter of the defendant on the basis of the concubinage of her parents.

I do not agree, however, that the evidence presented before the lower court was sufficient to prove the possession by the minor of the status of defendant's natural daughter nor that the mere proof of paternity in a case like the present one warrants the affirmance of the judgment.

The lower court found proved that the defendant sustained relations with María Figueroa Fuentes and that when the latter became pregnant he urged her to procure a miscarriage by means of criminal abortion, for which he gave her $25. That finding is clearly supported by the evidence but since said relations were prior to the minor's birth, they merely tend to prove the paternity but not the possession of the status of natural daughter. They possibly constitute the first link in a series of facts leading to such a status. This likewise applies to the physical resemblance between the minor and the defendant to which the lower court referred in its findings. Such a resemblance has nothing to do with the possession of the status, although it is an operative factor for determining the paternity.

The lower court likewise states in its findings of facts that the defendant sent $10 to María with her brother while she was in the hospital and that defendant insisted "in complying with his fatherly duties on condition that plaintiff should give up her daughter to his wife; and finally that he

was affectionate and lovable with the child when he saw her for the first time at his house." As to these last two particulars I must state that the findings are not strictly in harmony with the evidence introduced before said court. As to the $10, the minor's mother herself testified that the defendant sent the money to the hospital with her brother "because I needed a girdle," and Francisco Figueroa Fuentes, the minor's uncle, stated that "she (referring to his sister, the girl's mother) was in the hospital and he, defendant, sent her the money (the $10) for a girdle."

As to the statement that defendant insisted "in complying with his fatherly duties on condition that plaintiff should give up her daughter to his wife," it is sufficient to say that the transcript of the evidence merely discloses that María Figueroa Fuentes, the minor's mother, testified that after the child was born she sent word to the defendant to give her some money, at least for the milk of the child, and that he asked in return "to send him the child *in order that he and his wife could acknowledge her*," but she also testified that "after the child was born he did not send her a single penny for her support"; that *Rosa Nieves Rosado* once stopped the defendant, when the child was two months old, and told him that María wished to tell him "to send her at least seventy cents for the baby's milk because she had undergone an operation and could not work and *he replied that why did she not give up the girl in order that he and his wife could acknowledge her*" and she told him: "she can not give up the child to be acknowledged by his wife"; that upon being cross-examined by the defendant whether "he had admitted at any time that the girl was his," she answered *"he merely asked me why did not María give him the girl in order that he and his wife could acknowledge her*, but after that we never spoke of the matter"; that *Jacinta Santiago* took the minor on three consecutive Sundays to defendant's house, and that on the first two occasions he was not there but that the third time they found him there and he

then took the child, began to kiss her and held her in his arms for about two hours; that *"his wife told me that if María gave them the child they would both recognize her as their own,"* and that the second time that she visited defendant's wife the latter gave the child some milk. This is all the evidence appearing from the record tending to show that the minor enjoyed the uninterrupted possession of the status of defendant's natural daughter.

In the case at bar the evidence shows that defendant was married to another woman at the time he had relations with the minor's mother. Since the child was born in 1948 the action of acknowledgment must be governed by Act No. 229 of May 12, 1942 (Sess. Laws, p. 1296), as amended by Act No. 243 of May 12, 1945, (Sess. Laws, p. 814). Section 1 of this Act provides: "All children born out of wedlock subsequent to the date this Act takes effect, shall be natural children, whether or not the parents could have married at the moment when such children were conceived." Upon referring to said Section in *Vargas* v. *Jusino*, 71 P.R.R. 362, 366, we said: "Said Act only operates prospectively and the acknowledgment authorized under it, whether voluntary or involuntary, should conform to the provisions of § 125," citing *Elicier* v. *Heirs of Cautiño*, 70 P.R.R. 407, and *Correa* v. *Heirs of Pizá*, 64 P.R.R. 938.

The § 125 mentioned in *Elicier* v. *Heirs of Cautiño, supra,* is none other than § 125 of the Civil Code, 1930 ed. It essentially provides:

"The father is obliged to recognize the natural child:
"1. . . . . . .
"2. Where the child has uninterruptedly enjoyed the condition as of a natural child of the defendant father justified by acts of the same father or of his family."

Construing that Section, in a long line of cases, this Court has held that *proof of the possession of the status must be strong and convincing.* *Santiago* v. *Martínez*, 72 P.R.R. 873, 880; *Vázquez* v. *Boyrié*, 52 P.R.R. 826, 829; *Torres* v. *Heirs*

*of Caballero,* 39 P.R.R. 654, 659; *Fontánez* v. *Heirs of Buxó,* 36 P.R.R. 202, 207; *Vega* v. *Heirs of Vega,* 32 P.R.R. 548, 551; *Medina* v. *Heirs of Bird et al.,* 30 P.R.R. 151, 154; *Marrero* v. *Fordham et al.,* 27 P.R.R. 649, 653; *Méndez* v. *Martínez,* 21 P.R.R. 238, 252; *Negueruela et al.* v. *Somohano,* 16 P.R.R. 658, 659.

In *Vargas* v. *Jusino, supra,* this Court stated on page 367 that "The possession of status referred to in the Civil Code, is the public reputation which a child bears with reference to its natural father, where this reputation is formed by direct acts of the father himself or of his family demonstrative of the true acknowledgment, perfectly voluntary, free and spontaneous," citing *Fontánez* v. *Heirs of Buxó, supra; Vega* v. *Heirs of Vega, supra,* and *Montalvo* v. *Montalvo et al.,* 25 P.R.R. 800. It further stated on page 368 that "mere proof of paternity, even coupled with kind and affectionate acts, presents or admissions of paternity, will not suffice to give a right of action of acknowledgment."

In *Torres* v. *Heirs of Caballero, supra,* this Court stated on page 659: "At any rate, it must be remembered always that *evidence of the acts of acknowledgment must be strong and convincing* . . . and that it must not be of isolated acts, but of such a nature as to show the continuous possession of the status of natural child from the alleged father or his family . . ." On the other hand, in the *Desmornes* v. *Unknown Heirs of Adolfo Desmornes,* 13 P.R.R. 18, 27, it was said: "The possession of the status of a natural child requires only the continuation of acts which present a person in the uninterrupted relation of a natural child, to another person, . . ." Also in *Colón* v. *Heirs of Tristani,* 44 P.R.R. 163, 174, it was held that: "the word *'continuo'* (uninterrupted) should be taken to mean a series of acts, a set of facts carried out by the person from whom the acknowledgment is claimed, sufficient, if considered as a whole, to constitute the uninterrupted condition of a natural child."

A brief examination of the evidence introduced in the lower court conclusively shows that it was not as strong and convincing as our case law has required for a great number of years. And it does not show that the alleged acts of acknowledgment were uninterrupted. There was mere proof of paternity and of rather isolated acts of acknowledgment. These isolated and sporadic acts are insufficient. We shall see:

In addition to the intimate relations between the minor's father and its mother, to the fact that the defendant suggested to the latter to procure a miscarriage and in addition to the physical resemblance existing between the girl and the defendant, all of which, as we have said, has nothing to do with the possession of the status, what other evidence does the record contain showing the alleged uninterrupted possession of the status of natural child? Solely and exclusively the facts which, evidently characterized by their redundance, I pass on to copy briefly: (1) the remittance of $10 to the minor's mother for a girdle immediately after childbirth; (2) the statement of the mother to the effect that she asked the defendant for money to buy milk for the child and that he "sent word to send him the child in order that he and his wife could acknowledge her"; (3) defendant's answer to Rosa Nieves Rosado when the latter told him, that María wanted 70¢ for the child's milk, to the effect that "why did she not give up the girl in order that he and her wife could acknowledge her." (This is nothing more than a repetition of what the minor's mother testified on hearsay, which we already copied under number (2) of this same paragraph); and (4) the three visits made by Jacinta Santiago to defendant's house, during the first two of which the latter was absent and in the last one when defendant, according to the lower court, was affectionate and lovable to the minor.

Those interrupted and isolated acts in nowise comply with the statutory requirements nor with the well-settled and uninterrupted rule established by this Court ever since 1907.

For this reason I believe that, based on the possession of the status of natural child, the complaint should not have prospered either.

---

MR. JUSTICE SIFRE, with whom MR. JUSTICE PÉREZ PIMENTEL concurs, dissenting.

I dissent from Mr. Justice Ortiz's opinion, for irrespective of the doctrine requiring that evidence of uninterrupted possession of the status of natural child must "be strong and convincing," the evidence in this case does not warrant the affirmance of the judgment appealed from.

The complaint herein requests that Migdalia be adjudged to be a natural daughter of the defendant, because (1) she was born of parents who "lived together as husband and wife"; (2) the defendant "has always treated the minor, publicly and privately, as his own daughter, having furnished plaintiff prior to giving birth to said minor, with support for her care and attention and for childbirth," and (3) Migdalia Figueroa "is and has always been in the uninterrupted possession of the status of natural daughter of the defendant . . ."

The Justice referred to states, that the trial court erred "in concluding that the evidence showed that María Figueroa Fuentes and Telesforo Díaz lived in concubinage," but calling on the doctrine that "the appeal is taken from a judgment and not from the reasoning of the opinion," he upholds the judgment rendered, because he believes that "in view of the special circumstances of this case the uninterrupted possession of status was proved."

His analysis of the evidence is twofold. First, he refers to the evidence on the existence of concubinage, and concludes that it is insufficient. Then to the evidence which, in his judgment, shows "the uninterrupted possession of the status," stating:

We shall now examine the evidence presented in this case. According to the evidence introduced by the plaintiff and believed by the lower court, in connection with the possession of the status, when the mother was in the hospital, the defendant sent her $10. On another occasion, the defendant asked the mother, through a third person, to send him the child in order to acknowledge her together with his wife. Plaintiff sent the girl three times to defendant's house and on one of those occasions the defendant took the child in his arms and held her for about two hours. Defendant's wife also asked that the child be given to her and her husband in order to acknowledge her."

I entirely agree with Mr. Justice Ortiz's opinion that "the child born out of wedlock subsequent to the enactment of Acts Nos. 229 of 1942 and 243 of 1945, must show, in a filiation suit, that it is covered by the provisions and requirements of § 125 of the Civil Code," *in this case those of paragraph 2 of said Section,* but I fail to find the ground for his holding that Migdalia had been in *the uninterrupted possession* of the status of natural daughter of defendant.

He states that "Taken in an isolated fashion, it could be argued that said evidence, under the prevalent rule in this jurisdiction, which we now discard, was neither strong nor convincing," but that "Taking the problem as one of preponderance of the evidence which the court might believe, not in an openly erroneous manner, and as one of inquiry and showing of the truth, this evidence should be considered in the light of the whole set of circumstances of this case."

Pursuant to the provisions of paragraph 2 of the aforesaid § 125 of the Civil Code, the father is bound to acknowledge a child where the *"child has uninterruptedly enjoyed the condition as of a natural child of the defendant father justified by acts of the same father or of his family."* (Italics ours.) Without being induced by the doctrine of the "strong and convincing evidence" rule as to which, not being it necessary, I am not expressing my view point, and applying to "the whole set of circumstances of this case," the doc-

trine of the preponderance of the evidence, as it is being done by Justice Ortiz and even giving the most liberal interpretation to the adjective *continuo* (uninterrupted), it is obvious that it is a clear mistake to conclude that the evidence presented shows the uninterrupted possession of the status in accordance with the acts defined by the statute. I do not think that an evidence which, according to said magistrate, *"in connection with the possession of the status"* shows, (*a*) that while the mother was in the hospital the defendant sent her $10; (*b*) that on another occasion he requested the child's mother, through a third person, to send him the child in order for him and his wife to acknowledge her; (*c*) that on three occasions plaintiff sent Migdalia to defendant's house, and on one of them defendant held her in his arms for about two hours, and (*d*) that defendant's wife also requested that the child be given to her and her husband to be acknowledged, warrants the aforesaid conclusion.[1] As a matter of law, the conclusion is incorrect since it is the result of a misinterpretation of the juridical concept of the uninterrupted possession of the status of a natural child, as well as of the acts required to establish it.

The uninterrupted possession of status must be established by acts which show the intention of the father or of

---

[1] María Figueroa Fuentes testified that after becoming pregnant, defendant visited her three times but never after Migdalia was born. Of the three occasions on which it is said that Migdalia was sent to defendant's house, only on one occasion, according to plaintiff's evidence, defendant was at his home.

Francisco Figueroa Fuentes, María's brother, testified that Telesforo Díaz never told him that Migdalia was his daughter.

Rosa Nieves Rosado, witness for the plaintiff, was asked the following question: "Did he on any occasion admitted that the girl was his?" She answered: "Well . . . He only told me that María should give him the child because he and his wife wanted to acknowledge her, but then we never spoke about that again."

As to acts performed by defendant's family the only thing which we have found in defendant's evidence is that Telesforo Díaz's wife stated in an occasion that "if María would give the girl to them they would then acknowledge her as their daughter," and on three occasions she sent for Migdalia and was nice to her, feeding her milk in one of the occasions.

his family, if it be the case of treating the person seeking acknowledgment as a natural child, that is, acts which reveal the intention of considering and treating him as such. The period of time during which said acts ought to be manifested is not of vital importance provided it is long enough to allow for other manifestation. What is really fundamentally important, is that the acts indicate perseverance in demonstrating the intention to consider as his own the child who claims to be such. Mr. Justice Ortiz states that: "The period of time for performing acts which led to the possession of status was rather short," and that "we must consider that if the acts of the defendant and his family were rather sparse, *it was possibly* due to the date when the complaint was filed." (Italics ours.) The girl was born on December 19, 1948 and the action was filed nine months later. If the putative father had the intention of acknowledging Migdalia as a natural daughter, he could have during said period of time manifested his intention by acts indicative of his wish. He fail to do so.

It is my opinion that what prevents the acknowledgment in the case at bar, is not the element of time, but the absence of those acts required to arrive at the conclusion of law that the legal requirement of the possession of status is present. As we have seen, the very author of the opinion considers them "rather sparse," and states that "it was possibly due to the date when the complaint was filed." He speculates about a fundamental element of the cause of action which may not and should not be subject to conjectures.

Mr. Justice Ortiz believes that there are certain circumstances in this suit, which justify his conclusion. He states that, "The essential rule in this kind of cases is to avoid fictitious claims as to the status of a child as a member of the family" but that "if the father himself has the opportunity to appear, testify and present evidence, the probabilities of false allegations of filiation are foreclosed." We are not in complete disagreement. Undoubtedly, the presump-

tive father is generally in a better position to defend himself than his heirs. However, acts which are by themselves, by their own nature, insufficient to prove a cause of action, do not fail to be so because the presumptive father is alive and defends himself. If the "rule in this kind of cases is to avoid fictitious claims, . . ." such purpose can not be achieved merely because the father may object to the claim. In order to attain it the plaintiff must be required to show that he is entitled to the acknowledgment, *pursuant to the legal provision under which he makes his claim,* which provision contains the requirements that the legislator has deemed prudent to exact for the protection of all the interested parties in an ever complex problem of great social preponderance.

My distinguished colleague states that, "Another element that singles out this case is the fact that the child in question was known previously as *adulterine,*" adding that, "In such cases, a married father, in a certain social atmosphere is not inclined to make any ostentation of his relationship to that kind of children." We may presume it. He further states that "That reluctance constitutes a relevant factor as to the uninterrupted possession of status, . . ." We disagree. That factor is not and may not be "relevant" as to the uninterrupted possession of status. The judge however, may consider it in weighing the evidence and by "estimating in each case the nature, transcendency and scope of the acts of acknowledgment attributed to the natural father or to his family," and not only in the case of an adulterine child, but also in the filiation of those who do not fall into that category because at the time of their conception the parents could have married, since in those cases also, although perhaps less frequently, the parents might not be inclined to make any ostentation of their relationship to that kind of children. Judgment of the Supreme Court of Spain of June 26, 1903. The factor to which we refer, is one which, because of our human condition and the social reality, should not be overlooked upon considering the circumstances of each case which

are "determinative of the scope and transcendency of the significant acts demonstrative of the uninterrupted possession of the status of natural child," but in no way whatsoever shall it be given the force and effect of exonerating the adulterine child from the obligation of proving acts which when impartially and judicially weighed, show the uninterrupted possession of status. From the instance that plaintiff requests the acknowledgment under paragraph 2 of § 125 of the Civil Code, she should not be allowed on the one hand to invoke it and on the other to discard it, by failing to prove her status as required by the legal provision on which she bases her cause of action. In my opinion, this is the situation in the case at bar. Once we eliminate the theory of concubinage, which in my opinion was correctly done by my colleague and hence, the presumption of fatherhood flowing from that relation, there only remains the fact that the mother and the presumptive father of Migdalia had sexual intercourse, which does not establish the presumption of fatherhood, as well as certain other acts, few and isolated, which are totally insufficient to justify his conclusion as to the uninterrupted possession of status.

The opinion cites statements made by the learned retired Chief Justice Del Toro, in *Ortiz* v. *Dragoni*, 59 P.R.R. 14, reaffirming that "There should be no fatherless children." Who would want to hold the opposite? The answer is clear. However, we are expressing a criterion based on a specific legislation that was in force when Migdalia was born (the Act to which this opinion strictly refers), and we should not commit the error of letting our personal feelings interfere with the standards of law, which in the instant case are clear.

Only under the theory that Acts No. 229 of 1942 and No. 243 of 1945 amended paragraph 4 of § 125 of the Civil Code authorizing acknowledgment when by any means of proof fatherhood is shown, might we concur in the conclusion reached by Mr. Justice Ortiz, but we can not accept that

theory.[2] If the legislator had intended to authorize the evidence of paternity by any proof or by any means, he would have so stated as he did in the Civil Code of 1902. Even if we liberally construe Acts Nos. 229 and 243, we can not adopt the theory, without violating well-settled juridical principles, that the aforesaid paragraph was implicitly amended, by eliminating the word "authentic," or giving to this word a meaning that it does not have at law.

The main purpose of said law was "to eliminate the differences between children born out of wedlock, derived from the different condition of their parents and to include them all under the sole category of natural children for all legal effects,[3] but never to change the standards established in the Civil Code for obtaining acknowledgment. This is the same view taken by Dr. Luis Muñoz Morales in his *Anotaciones al Código Civil de Puerto Rico*, Vol. 1, p. 407. He states that, as a result of Act No. 229, "all the provisions of the Civil Code in force which are applicable to the other natural children shall be likewise applicable to children formerly characterized as adulterine or incestuous." Silence of the lawmaker regarding said provisions may not give rise to any other inference except that he meant to accept as he actually did accept, that they would apply to all the children born out of wedlock under said laws which were, undoubtedly, inspired in the highest sense of justice.

---

[2] Paragraph 4 of § 125 of the Civil Code, 1930 ed., reads:
"When the child may present any authentic evidence of his paternity."

[3] *Anotaciones al Código Civil*, by Dr. Luis Muñoz Morales, Vol. 1, p. 401.